UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
WILLETS POINT INDUSTRY AND REALTY
 ASSOCIATION, et al.,

                    Plaintiffs,             **MEMORANDUM & ORDER**

         - against -                 No. 08-cv-1453 (ERK)(JO)

CITY OF NEW YORK, et al.,

                    Defendants.
-----------------------------------------------------------------X

KORMAN, J.:

      Willets Point is an industrially-zoned neighborhood in northern Queens, New York, consisting primarily of auto-related and waste management businesses. (Compl. Ex. C at 2.) The Willets Point area was originally a swamp. Surrounding areas began using it as a dumping site for ash and garbage in the nineteenth century. This practice continued until part of the landfill was converted into the World's Fair Grounds in 1939, at which point machine shops and garages started being built in the area. By 1950, several small factories, auto-related shops, garages, and storage areas cemented the industrial character of the area. (Compl. Ex. B at 7.)

      The complaint in this case centers on the conceded fact that the City of New York (the "City") has invested little money in the infrastructure of this neighborhood. Though the area does have a network of storm sewers, they are largely in disrepair (Compl. Ex. B at 7), and the neighborhood entirely lacks a sanitary sewer system (Compl. Ex. A at 4). Streets in the neighborhood are not well-maintained, and often are unpaved or severely potholed (Compl. Ex. A at 32; Ex. B at 7), while most curbs and sidewalks in the neighborhood were either never constructed or have worn away entirely (Compl. Ex. A at 32). The neighborhood additionally suffers from a lack of functional fire hydrants or regular trash removal. (Compl. ¶¶ 51, 55, Ex. D

photographs 4, 6, 7, 10, 10a, 14-14b, 26, 32, 32a, 34-37.)

The City has, from time to time, considered some development of the Willets Point neighborhood. As early as the 1960s, Robert Moses proposed turning Willets Point into a parking lot for Shea Stadium and the 1963-64 World's Fair Grounds. (Compl. ¶ 31, Ex. A at 15, Ex. B at 7.) The complaint alleges that this effort was successfully frustrated with the assistance of "[a] young lawyer named Mario Cuomo . . . leaving Willets Point in peace (albeit without infrastructure) until the early 1990s." (Compl. ¶ 31.) In 1991, apparently in response to a 1989 petition by a group of Willets Point businessmen, including certain plaintiffs, a study undertaken at the request of the Queens Borough President, Claire Shulman was completed. (Compl. ¶ 32.) This study, entitled the *Willets Point Planning Study*, found that "without an adequate sewer and street system . . . the future prospects for Willets Point will be limited. The area desperately needs a renewed infrastructure." (Compl. ¶ 60, Ex. A at 1.) The study observed that existing storm sewers "are clogged and ineffective for anything but the gentlest showers," and that in at least one section they had been "collapsed since 1961, and a 4 foot wide puddle covers much of [the street] in all seasons." (Compl. Ex. A at 28.) Moreover, the streets of Willets Point are "dilapidated and abused" (Compl. Ex. A at 32), and some were in "such poor condition that it is unclear if they were ever paved at all" (Compl. Ex. A at 32). A 1993 study, also commissioned by the Queens Borough President, and an April 2006 *Willets Point Land Use Study* completed by the Hunter College Center for Community Planning & Development, reported substantially the same infrastructure impediments. (*See generally* Compl. Exs. B, C.)

In 1999, certain members of the Willets Point Industry and Realty Association—an organization of local businesses—met with various representatives of the City's Department of Environmental Protection, Department of Transportation, Department of Sanitation, and the

Office of the Mayor, again pleading for infrastructure improvements. (*Id.* ¶¶ 63-67.) Most recently, in 2002, the City created the Downtown Flushing Task Force ("Task Force"), a group of public officials and private representatives that the City organized to identify growth and improvement opportunities in the downtown Flushing and Willets Point area. The Task Force generated the Downtown Flushing Development Framework, a land use and economy planning strategy, which identified redevelopment goals for the Willets Point area including "creating a regional destination that would enhance economic growth in Downtown Flushing and Corona." Final Generic Environmental Impact Statement, Willets Point Development Plan ("FGEIS"), Sept. 12, 2008 at S-1, S-2, *available at* http://www.nyc.gov/html/oec/downloads/pdf/Willets_Point/FGEIS/00_Executive_Summary.pdf. Based on these guidelines, the City created the Willets Point Advisory Committee, chaired by the Queens Borough President, which developed the Willets Point Development Plan ("Plan").

The $3 billion Plan was unveiled by Mayor Bloomberg on May 1, 2007. *See* Anahad O'Connor & Terry Pristin, *Bloomberg Unveils Plan to Redevelop Willets Point*, N.Y. Times, May 1, 2007, *available at* http://www.nytimes.com/2007/05/01/nyregion/01cnd-willets.html. When implemented, it would "transform a largely underutilized site with substandard conditions and substantial environmental degradation into a lively, mixed-use, sustainable community and regional destination," which would contain "residential, retail, hotel, convention center, entertainment, commercial office, community facility, open space, and parking uses." FGEIS at S-1. The Plan contemplates various infrastructure improvements, including construction of new sanitary and stormwater sewers, a sanitary pump station, additional power lines, and new roadways and bicycle lanes. *Id.* at S-8, S-9. Moreover, under the Plan, the City is authorized to acquire property in Willets Point, including through the use of its power of eminent domain. *Id.*

at S-4; Fernanda Santos, *Willets Point Project Foes Reach Deal With the City*, N.Y. Times, Nov. 12, 2008, *available at* http://www.nytimes.com/2008/11/13/nyregion/13willets.html. After much controversy, debate, and negotiation, the City Council overwhelmingly approved the Plan by a vote of 42 to 2. Fernanda Santos, *Council Approves Queens Redevelopment Plans*, N.Y. Times, Nov. 13, 2008, *available at* http://cityroom.blogs.nytimes.com/2008/11/13/council-approves-queens-redevelopment-plans.

The Plan provided the impetus for this lawsuit by plaintiffs, who "have thriving businesses that have been, in some cases, there for two generations," and who oppose the Plan because "[their businesses will be] destroyed by taking over [of] the property by eminent domain." (Hr'g Tr. 16:18-21, May 4, 2009.) The thrust of the complaint, however, is not based on the propriety of the City's condemnation of any property in Willets Point through the exercise of its power of eminent domain. Indeed, the complaint does not allege that the City has acquired any of plaintiffs' property in this way. Instead, the complaint alleges that the City violated plaintiffs' equal protection and due process rights by declining to provide services and infrastructure to Willets Point in an attempt to depress property values in the area and give the City an economic advantage when exercising its right of eminent domain to affect its current plan for redevelopment. (Compl. ¶ 80.)

Specifically, the plaintiffs have alleged that the defendants "have systematically deprived Willets Point of the vital infrastructure" (Compl. ¶ 3) in order to "driv[e] down the value of the existing businesses and their property, so that the City more easily can justify and finance the exercise of its powers of eminent domain" (Compl. ¶ 5) as part of a "forty-year effort to condemn Willets Point, destroy its businesses and deliver it to developers" (Compl. ¶ 31). This began during the 1960s, when businesses would have been forced to close under Robert Moses's

plan to incorporate Willets Point into the 1963-64 World's Fair Grounds (Compl. ¶ 31, Ex. A at

15), continued through 1977 when Governor Hugh Carey organized a bid for the 1984 Summer

Olympic Games which would have included building in the neighborhood (Compl. Ex. A at 33),

and through the land use studies of the 1990s which proposed eminent domain as a means of

revitalizing the neighborhood.  Moreover, the plaintiffs allege that the City's newest plan to

condemn the area, rezone it, and replace the existing businesses is only the latest reincarnation of

the City's policy of neglecting the Willets Point neighborhood to drive down property values.

(Compl. ¶ 33.)  The City has moved to dismiss the complaint.

## DISCUSSION

**A.      Standard of Review**

In order to survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint must allege "enough facts to state a claim of relief that is plausible on its face."  *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In conducting this analysis, the Supreme

Court has suggested a two-pronged approach:

> [A] court considering a motion to dismiss can choose to begin by identifying pleadings
> that, because they are no more than conclusions, are not entitled to the assumption of
> truth.  While legal conclusions can provide the framework of a complaint, they must be
> supported by factual allegations.  When there are well-pleaded factual allegations, a court
> should assume their veracity and then determine whether they plausibly give rise to an
> entitlement to relief.

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).  The *Iqbal* Court continued: "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged."  *Id*. at 1949.  This plausibility

determination is "a context-specific task that requires the reviewing court to draw on its judicial

experience and common sense."  *Id*. at 1950.  Factual allegations do not "plausibly give rise to an

entitlement of relief" where those factual allegations, taken as true, are "merely consistent with a

defendant's liability," *id.* at 1949, but are also "not only compatible with, but indeed . . . more likely explained by, lawful . . . behavior," *id.* at 1950-51.  Thus, where there is an "obvious alternative explanation" that is more likely, the plaintiff's cause of action is not plausible and must be dismissed.  *Id.* at 1951.

## B.     Equal Protection Cause of Action

### 1.     Plausibility of Class-of-One Claim

Plaintiffs' first cause of action is a violation of the Equal Protection Clause, which allegedly arose out of the City's malicious failure to provide municipal infrastructure to plaintiffs while "routinely provid[ing it] to similarly situated persons."  (Compl. ¶ 85-86.)  The root of plaintiffs' claims is that "[f]or decades, the [d]efendants . . . have waged a campaign of willful neglect against [p]laintiffs and other businesses in Willets Point," (*id*. at ¶ 2), by "systematically depriv[ing] Willets Point of the vital infrastructure that every neighborhood needs and to which each is entitled, including storm sewers, sanitary sewers, paved streets, gutters, fire hydrants, snow removal and trash removal" (*id*. at ¶ 3).  Plaintiffs allege that the City has engaged in a "forty-year effort to condemn Willets Point, destroy its businesses and deliver it to developers" (*id*. at ¶ 31), while "provid[ing] other comparable manufacturing neighborhoods in the City with the infrastructure that they are denying to Willets Point" (*id.* at ¶ 74).  Plaintiffs go on to allege that the City

> lack[s] a rational basis for discriminating against Willets Point and denying it this infrastructure.  On information and belief, the City Defendants are doing so because, with illicit motivation and without rational basis:
>
> (a) the City Defendants wish to depress Plaintiffs' property values and harm Plaintiffs' businesses in order to facilitate New York City's unlawful acquisition of Willets Point;
>
> (b) the City Defendants wish to replace Plaintiffs and the other Willets Point businesses with new businesses wrongfully favored by the City Defendants; and

(c) the City Defendants wish to unlawfully deprive Plaintiffs and the other Willets Point businesses of the infrastructure to which they are entitled.

(*Id.* at ¶ 80.)

The root of the Equal Protection Clause is the requirement that all similarly-situated individuals be treated alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). While equal protection claims typically involve allegations of discrimination based upon the plaintiff's membership in a vulnerable class, such as a particular race or religion, "class-of-one" equal protection claims are recognized where, rather than alleging membership in any particular protected group, a plaintiff instead alleges (1) that he or "she has been intentionally treated differently from others similarly situated and [(2)] that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

Prior to *Olech*, the Second Circuit held that a class-of-one plaintiff must also establish the defendant's malice or bad faith. Since then, it has repeatedly declined to decide whether *Olech* eliminated this traditional requirement. *See Bizzarro v. Miranda*, 394 F.3d 82, 88-89 (2d Cir. 2005); *Harlen Assoc. v. Inc. Village of Mineola*, 273 F.3d 494, 499-500 (2d Cir. 2001); *Giordano v. City of New York*, 274 F.3d 740, 751 (2d Cir. 2001). Nevertheless, district courts since *Olech* have typically required that a successful class-of-one plaintiff establish (1) that he or she was intentionally treated differently from other similarly situated individuals, and (2) the disparate treatment was *either* (a) without a rational basis, or (b) motivated by animus. *See Oleson v. Morgan*, No. 06-CV-959, 2009 WL 2045682, at *7 (N.D.N.Y. July 8, 2009), *Whalen v. City of Syracuse*, No. CV-08-0246, 2008 WL 2073941, at *1 (N.D.N.Y. May 14, 2008), *Assoko v. City of New York*, 539 F. Supp. 2d 728, 735 (E.D.N.Y. 2008). Other courts have distinguished between class-of-one claims, requiring satisfaction of the *Olech* elements, and the alternative

"selective enforcement" claims, requiring a showing of disparate treatment based upon either impermissible considerations such as race or religion, or malicious or bad faith intent to injure the plaintiff. *See Green v. City of New York*, No. 06-CV-1836, 2009 WL 3319356, at *10 n.13 (E.D.N.Y. Oct. 14, 2009); *Casciani v. Nesbitt*, No. 08-CV-6162L, 2009 WL 3172684, at *23 (W.D.N.Y. Oct. 6, 2009). Under any variation of the test applied in post-*Olech* cases, plaintiffs' equal protection cause of action cannot survive. They have simply failed to plausibly establish that a rational basis is lacking for the alleged disparate treatment of Willets Point or that it was motivated by a malicious intent to injure plaintiffs that was harbored by the last six Mayors of the City of New York and countless numbers of City officials, including the last four Queens Borough Presidents, who have held positions capable of exercising significant influence over the City's course of conduct.

Pursuant to *Iqbal*, the motion to dismiss analysis begins with the "identif[ication of] the allegations in the complaint that are not entitled to the assumption of truth." 129 S. Ct. at 1951. Many of plaintiffs' allegations in support of their cause of action are nothing more than "bare assertions" amounting to a "formulaic recitation of the elements of a . . . [class-of-one equal protection] claim." *See id*. These include allegations that the City "lack[s] a rational basis for discriminating against Willets Point" (Compl. ¶ 80), "wish[es] to unlawfully deprive Plaintiffs . . . of the infrastructure to which they are entitled" (*id*. at ¶ 80(c)), and "maliciously acted and failed to act in a manner that was intentionally wrong, without rational basis and without furthering a legitimate government objective" (*id*. at ¶ 86). Significantly, plaintiffs' allegations regarding the City's allegedly improper motive—namely, the City's desire to depress plaintiffs' property values in order to facilitate its future acquisition of Willets Point at a discount—is also conclusory. *See Moss v. United States Secret Service*, 572 F.3d 962, 970 (9th

Cir. 2009) (bald allegation of impermissible government motive is conclusory and may be disregarded under *Iqbal*). Moreover, it cannot be reconciled with New York law, under which an "aggrieved property owner has a remedy where it would suffer severely diminished compensation because of acts by the condemning authority decreasing the value of the property." *See City of Buffalo v. J.W. Clement Co.*, 269 N.E.2d 895, 905 (N.Y. 1971); *In re 572 Warren Street*, 298 N.Y.S.2d 429 (N.Y. Sup. Ct. 1968).

The second step of the *Iqbal* analysis is to discern whether the remaining well-pled factual allegations "plausibly suggest an entitlement to relief." *Iqbal*, 129 S. Ct. at 1951. It is assumed to be true, and, indeed, there is no serious dispute, that the storm sewers of Willets Point "have been neglected for decades and quickly overflow" (Compl. ¶ 40), that "Willets Point has no municipal sanitary sewers at all" (*id*. at ¶ 43), and that Willets Point roads "are severely cratered with potholes" (*id*. at ¶ 47). The complaint also alleges that "the deplorable condition of the Willets Point infrastructure has been well known to the City . . . for several decades" (*id*. at ¶ 57), in part due to a series of studies conducted by various community groups and documented in corresponding reports (Compl. ¶¶ 60, 62, 68; Exs. A, B, C), and in part due to the plaintiffs' requests of the City for greater investment in infrastructure and services (*id*. at ¶¶ 63-67, 72-73). I assume for present purposes that these well-pled factual allegations are consistent with plaintiffs' claims that, in failing to provide infrastructure and municipal services, the City "maliciously acted and failed to act in a manner that was intentionally wrong, without rational basis and without furthering a legitimate government objective." (Compl. ¶ 86.)

Nevertheless, there are "obvious alternative explanations," indeed more likely explanations, for why the City would choose to invest in the infrastructure of some neighborhoods over others. First, unlike Willets Point, which is devoid of residential housing,

and is not alleged to have a single resident, each of the allegedly "similarly situated" neighborhoods mentioned in the complaint include significant residential areas, public schools, and parks. Indeed, Willets Point is not a neighborhood that Mr. Rogers would recognize. Nor does it immediately abut any residential neighborhood. On the contrary, to the north, it is bordered by the Whitestone Expressway (on the other side of which is Flushing Bay), on the south, by the MTA bus depot and railyard, to the east, by the Flushing River (which separates Willets Point from Flushing), and to the west by CitiField (and the parking lots surrounding it).

More significantly, documents annexed to the complaint, upon which I may rely on a motion to dismiss, *Automated Salvage Transp. v. Wheelabrator Envtl. Sys.*, 155 F.3d 59, 67 (2d Cir. 1998), establish that the conduct of the City was the product of an entirely rational cost-benefit analysis based on conditions that are unique to Willets Point. Specifically, the studies note that much of the Willets Point neighborhood once served as a dump for waste, so that "[a] layer of loose miscellaneous fill covers most of Willets Point," underneath which "is a 50-70 foot deep layer of loose organic silt." (Compl. Ex. A at 25.) Because of this unusual soil composition, the area is not ideal for the development of a sewer system, and "pile supports will be necessary to stabilize the sewer pipes on the layer of loose sand and silt." (Compl. Ex. A at 28; *see also* Compl. Ex. B at 8, 15.) Further complicating the addition of a sanitary sewer system is the fact that "[t]he Willets Point sewage system cannot connect to the existing sewers in the surrounding area because the existing sewers are too small to accommodate the additional flows." (Compl. Ex. A at 29.) The result is that connecting businesses in the Willets Point area to a sanitary sewer system would require the City to either build a small sewage treatment plant in the area or construct a sewer connection to pump sewage uphill to a larger sewer trunk about one mile away. (*Id.*)

Significantly, redevelopment studies of the area note that "[t]he present street system intensifies the sense of chaos," and that "Willets Point Boulevard, which slices through the street grid of the industrial park at a forty-five degree angle, creates many small, odd shaped blocks and intersections of three streets." (Compl. Ex. A at 31.) In particular, the oddities of the current street system have created an "intersection [which] has widened into an amorphous parking and storage area," and blocks which are "too small to be used efficiently." (Compl. Ex. A at 31-32.) This phenomenon prompted at least one of the studies to suggest the area's future redevelopment should include closing some streets in the neighborhood and re-opening others which had previously been leased to neighborhood businesses for use as storage space. (Compl. Ex. A at 41-42.) Under these circumstances, any development plan would likely involve large-scale changes to the zoning, use, and organization of the neighborhood.

Thus, the 1993 study commissioned by the Queens Borough President concluded that greater investment in Willets Point infrastructure could not be justified so long as the neighborhood remained primarily industrial in nature. Rather, the study suggested that for such investment to become cost-efficient, it should only be made once the area was redeveloped for non-industrial uses:

> Benefits should justify costs. The benefits from a project, *i.e.* employment and tax revenues, largely depend upon the type of use(s) that are developed on the site. In this case, since all three [suggested redevelopment] schemes essentially call for the continuation of industrial use in Willets Point, the resultant benefits are moderate and do not support the cost of providing the infrastructure improvements . . . To encourage greater job creation and justify the investment required by the City, it is appropriate and necessary to develop the site with non-industrial uses.

(Compl. Ex. B at 8.) Consequently, "to justify the substantial infrastructure investment that is currently needed in the area, [the] plan encourages appropriate new uses which will generate higher employment and taxes and transform the site's appearance into one which befits its

location." (Compl. Ex. B.) Moreover, because some form of redevelopment in Willets Point was contemplated, as plaintiffs' counsel conceded (Hr'g Tr. 20:9-13, May 4, 2009) ("The City thought of it as a place that some day they'll do something."), the City could rationally conclude that investment of enormous sums of money in infrastructure and other services before a redevelopment plan was finalized would be imprudent.

In sum, plaintiffs' equal protection claim is implausible because the allegations in the complaint are "not only compatible with, but indeed [were] more likely explained by" the City's rational and legitimate cost-benefit analysis and equally rational decision to delay the extraordinary expenditure of resources until a comprehensive redevelopment plan for Willets Point was finalized. *See Iqbal*, 129 S. Ct. at 1950. Significantly, the conclusion that the Equal Protection Clause cause of action must be dismissed is supported strongly by the fact that the City's conduct is subject only to rational basis review. Under this deferential standard, an equal protection challenge "must be denied if there is any reasonably conceivable state of facts that could provide a rational basis" for the government conduct. *Weinstein v. Albright*, 261 F.3d 127, 140 (2d Cir. 2001) (internal quotations omitted). Indeed, the asserted justification is "given a strong presumption of validity," and the government "need not provide any evidence to support the rationality of the reason. Further, the reason need not be one actually considered by [the government]." *Domond v. INS*, 244 F.3d 81, 87 (2d Cir. 2001) (internal quotation and citation omitted).

### 2. Discretionary Governmental Action

In *Engquist v. Or. Dept. of Agric.*, 128 S.Ct. 2146 (2008), the Supreme Court determined that class-of-one equal protection claims cannot be sustained in the context of public employment. *Id.* at 2154. The Court reasoned that

[t]here are some forms of state action . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. In such cases the rule that people should be "treated alike, under like circumstances and conditions" is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted.

*Id.* The Court further explained that

[w]hat seems to have been significant in *Olech* and the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in *Olech* that [the defendant] was exercising discretionary authority based on subjective, individualized determinations.

*Id.* at 2153.

While the Second Circuit has yet to rule on the issue, district courts have almost universally extended the *Engquist* reasoning to all class-of-one claims, such that successful plaintiffs now must additionally establish that the differential treatment was a result of *non-discretionary* state action. *See Casciani*, 2009 WL 3172684 at *24; *DeFabio v. E. Hampton Union Free Sch. Dist.*, No. 07-CV-1717, 2009 WL 3150248, at *25-26 (E.D.N.Y. Oct. 1, 2009); *Walker v. Daines*, No. 08-CV-4861, 2009 WL 2182387, at *12 (E.D.N.Y. July 21, 2009); *Seymour's Boatyard, Inc. v. Town of Huntington*, No. 08-CV-3248, 2009 WL 1514610, at *7 (E.D.N.Y. June 1, 2009); *Balakrishnan v. Kusel*, No. 08-CV-1440, 2009 WL 1291755, *5 (E.D.N.Y. May 8, 2009); *Crippen v. Town of Hempstead*, No. 07-CV-3478, 2009 WL 803117, at *4 (E.D.N.Y. Mar. 25, 2009); *Marino v. Shoreham-Wading River Cent. Sch. Dist.*, No. CV-08-0825, 2008 WL 5068639, at *7 (E.D.N.Y. Nov. 20, 2008); *Vassallo v. Lando*, No. CV-06-2520, 2008 WL 4855826, at *8 (E.D.N.Y. Oct. 31, 2008); *Nasca v. Town of Brookhaven*, No. CV-05-122, 2008 WL 4426906, at *11 n.4 (E.D.N.Y. Sept. 25, 2008); *Analytical Diagnostic Labs, Inc. v. Kusel*, No. CV-07-3908, 2008 WL 4222042, at *3 (E.D.N.Y. Sept. 15, 2008); *Sloup v. Loeffler*, No. CV-05-1766, 2008 WL 3978208, at *15 (E.D.N.Y. Aug. 21, 2008).

Here, the decisions made by the City regarding allocation of municipal resources are

exactly the type of discretionary governmental actions that are controlled by the reasoning in *Engquist*. As in *Engquist*, there is no clear standard against which to evaluate the City's decision to provide or not provide services to a particular neighborhood, as these decisions are inevitably based on a variety of differing factors such as geographical and physical limitations, municipal priorities, population characteristics and political considerations. Indeed, particularly in light of the City's current fiscal and budgetary difficulties, it is "undoubtedly within the proper province of [a] municipality to determine how limited resources are best utilized. In meeting their responsibilities to the City's inhabitants, municipal executives may allocate manpower and resources in such fashion as their best judgment indicates." *Towns v. Beame*, 386 F. Supp. 470, 474 (S.D.N.Y. 1974).

The New York Court of Appeals reached a similar conclusion in *Jones v. Beame*, 380 N.E.2d 277 (N.Y. 1978), where it determined that the expenditure of resources on municipal projects involved "questions of judgment, discretion, allocation of resources and priorities inappropriate for resolution in the judicial arena, the responsibility for which is lodged in a network of executive officials, administrative agencies and local legislative bodies." Moreover, because of the City's "prolonged financial crisis, threatened with bankruptcy, dependent on State and Federal fiscal assistance, and constrained by close regulation, [and] curtail[ing of] services and personnel efforts in efforts to achieve a balanced budget," "it is untenable that the judicial process . . . should intervene and reorder priorities, allocate the limited resources available, and in effect direct how the vast municipal enterprise should conduct its affairs." *Id*. at 278-79. These words apply with even more compelling force when a federal judge is asked to intervene and reorder priorities whether or not a fiscal crisis exists.

## 2. Procedural Due Process Cause of Action

### a. Constitutionally Protected Property Interest

Plaintiff's second cause of action is a procedural due process claim. The right to procedural due process, namely, notice and an opportunity to be heard, is dependent on a threshold showing that the plaintiff was deprived of a constitutionally protected "property interest." *See Bd. of Regents v. Roth*, 408 U.S. 564, 576 (1972). Plaintiffs argue that they had such an interest in the City's construction of new sanitary sewers as well as in the maintenance of sewer and other municipal infrastructure in Willets Point, of which they were improperly denied without "notice, explanation or an opportunity or forum to contest that deprivation." (Compl. ¶ 92.) To have a property interest, "a person clearly must have more than an abstract need or desire" and "more than a unilateral expectation of it." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005). Instead, a person must "have a legitimate claim of entitlement to it," which is "created and . . . defined by existing rules or understandings that stem from an independent source such as state law." *Id.* A benefit is not a protected entitlement if "government officials may grant or deny it in their discretion." *Id.*

While the New York City Charter delegates to various Commissioners the authority to maintain City infrastructure and provide municipal services, s*ee, e.g.*, N.Y.C. Charter §§ 753(a), 1403(b)(1), 2903(b); N.Y.C. Admin. Code § 16-124, it does not "explicitly confer[] a right directly on a class of persons that included the plaintiffs in [this] case." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690 (1979). The *Cannon* standard was articulated to determine whether a private right of action could be inferred from the violation of a federal statute, because the law was clear that the "fact that a federal statute was violated does not automatically give rise to a private cause of action in favor of that person." *Id.* at 689.

Nevertheless, it provides a useful guidepost in the present context. Indeed, it is entirely consistent with cases that have concluded that state law conferred protected property rights on particular individuals. Thus, in *Goss v. Lopez*, 419 U.S. 565 (1975), the Supreme Court held that students had "legitimate claims to a public education" because Ohio law expressly directed "local authorities to provide a free education to all residents between five and 21 years of age, and a compulsory-attendance law require[d] attendance for a school year of not less than 32 weeks." *Id.* at 573. Similarly, in *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1 (1978), Tennessee state law did "not permit a public utility to terminate service 'at will.'" *Id.* at 12. Instead, public utilities in Tennessee are obligated to provide service "to all of the inhabitants of the city of its location alike, without discrimination, and without denial, except for good and sufficient cause." *Id.* (internal quotations and citation omitted). Because public utilities could only terminate service "for cause," customers were held to have asserted a "legitimate claim of entitlement" within the protection of the Due Process Clause. *Id.* Unlike the laws at issue in *Goss* and *Memphis Light*, the Charter does not direct the City to maintain its infrastructure. Rather, it merely divides authority for different parts of the City's infrastructure and municipal services between various City administrative departments. The absence of a statutory right of entitlement also suggests the absence of a property interest in the City's services that plaintiffs seek to compel. *Castle Rock*, 545 U.S. at 765.

Moreover, even if the New York City Charter expressly imposed an obligation on the City to maintain existing infrastructure, that alone would not necessarily imply that *plaintiffs* have an individualized property right in the City's compliance with this obligation, for, "[m]aking the actions of government employees obligatory can serve various legitimate ends other than the conferral of a benefit on a specific class of people." *Id.*; *cf. Assoko v. City of New*

*York*, 539 F. Supp. 2d 728, 738 n.11 (S.D.N.Y. 2008) (dismissing procedural due process claim based on City's failure to enforce building code because Charter provision providing that the Department of Buildings "shall" enforce the code did not create an individualized entitlement running to plaintiffs).

Thus, where a municipality's obligation serves public rather than private ends, the mere existence of an obligation does not constitute a protected property interest if benefits are received by individuals only indirectly as members of the public at large. The shutdown of subway service occasioned by a strike called by the New York City Transit Workers' Union provides a useful illustration. The shutdown demonstrated so compellingly the extent to which the economic survival of the City depends on the functioning and viability of its subway system. Nevertheless, while a subway rider injured because of the City's negligence in the operation of the system may have a common law cause of action in negligence, he can hardly be said to have a property interest in the continued maintenance of the subway system at any particular level. Indeed, the New York caselaw holding municipalities liable for negligently inflicted injuries rejects the argument that the municipality owed the plaintiffs "a special duty." *Tappan Wire & Cable, Inc. v. County of Rockland*, 777 N.Y.S.2d 517, 519 (N.Y. App. Div. 2004). Instead, it is predicated on the common law rule that once a party undertakes certain acts, even those which it is not otherwise obligated to perform, it must do so in a manner that does not cause injury. *See, e.g.*, William L. Prosser, Law of Torts 343-34 (4th ed. 1971) ("[O]ne who, without any legal obligation to do so, attempts to remove ice from the sidewalk, may find himself liable when he makes the situation worse.") A holding that this common law obligation constitutionally vests a property right would elevate every tort committed by a municipality into a constitutional cause of action.

### b. Statute of Limitations

Plaintiffs' procedural due process cause of action is also barred by the statute of limitations. Because § 1983 does not contain a statute of limitations, the comparable three-year statute of limitations prescribed in New York applies. *Ormiston v. Nelson*, 117 F.3d 69, 71 (2d Cir. 1997). Federal law, however, "governs the determination of the accrual date (that is, the date the statue of limitations begins to run) for purposes of the statute of limitations in a § 1983 action." *Id.* Under federal law, the statute of limitations accrues "when the plaintiff knows or has reason to know of the injury which is the basis of his action," such as "when the plaintiff becomes aware that he is suffering from a wrong for which damages may be recovered in a civil action." *Singleton v. New York*, 632 F.2d 185, 191 (2d Cir. 1980).

Unlike plaintiffs' equal protection cause of action, which is based on an alleged "pattern, practice or policy" and is arguably timely under the continuing violation theory, *see, e.g.*, *Shomo v. City of New York*, 579 F.3d 176, 181-82 (2d Cir. 2009), the procedural due process cause of action is based on a discrete act of misconduct. Plaintiffs claim that the City failed to provide notice and a hearing prior to adopting its alleged policy of neglect. "When a single event gives rise to continuing injuries," the continuing violation theory does not apply. *Heard v. Sheahan*, 253 F.3d 316, 319 (7th Cir. 2001) (Posner, *J*). While plaintiffs here are unable to identify precisely when they should have been provided with a hearing, and while the outcome of the informal hearings they did receive in 1989 and 1999 suggests that it would not have made any difference, plaintiffs knew far more than three years before the filing of the complaint that the policy existed and that they had not been provided with prior notice or a hearing. Under these circumstances, their due process claim is time barred. *See Hoesterey v. City of Cathedral City*, 945 F.2d 317 (9th Cir. 1991).

## C.    Laches

In addition to compensatory money damages, plaintiffs seek a mandatory injunction requiring that the City construct and maintain infrastructure in Willets Point including storm and sanitary sewers, paved streets, gutters, fire hydrants, snow removal, and trash removal.  (Compl. ¶ 142.)  The doctrine of laches would preclude such relief even if plaintiffs' complaint stated a cause of action.  At the heart of plaintiffs' causes of action is the allegation that the City's failure to provide municipal services and infrastructure to the Willets Point neighborhood is the result of a "forty-year effort to condemn Willets Point, destroy its businesses and deliver it to developers." (Compl. ¶ 31.)  Nevertheless, in spite of the City's alleged four-decade effort to "systematically deprive[] Willets Point of the vital infrastructure that every neighborhood needs and to which each is entitled, including storm sewers, sanitary sewers, paved streets, gutters, fire hydrants, snow removal and trash removal" (*id*. at ¶ 3), the plaintiffs waited until 2008 to file a lawsuit against the City alleging violations of the Equal Protection and Due Process Clauses and requesting a writ of mandamus ordering the City to provide such services and infrastructure.  At oral argument on the instant motion, the parties were asked to submit supplemental briefing to "address to what extent . . . waiting 40 years should impact on [the plaintiffs'] ability to get injunctive relief" in the form of municipal services and infrastructure.  (Hr'g Tr. 73:13-15, May 4, 2009.)  While the City was responsive to the request, plaintiffs simply reiterated the argument that the continuing violation doctrine saved their causes of action for injunctive relief from the bar by the applicable statute of limitations.  This argument, however, confuses two separate issues.

The continuing violation doctrine addresses the issue when a cause of action accrues for the purpose of the applicable statute of limitations.  The doctrine of laches assumes that the cause

of action is not barred by any statute of limitations. As Judge McLaughlin has observed, "[t]he doctrine of laches has a historical pedigree pre-dating the statutory enactment of periods of limitations. Even when there were no statutory periods, the Chancellor in Equity, the 'King's Conscience,' could withhold relief when the plaintiff's delay in coming to Equity was inordinate and had caused prejudice to the defendant." *See Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997).

Laches is "an equitable defense based on the . . . maxim *vigilantibus non dormientibus aequitas subvenit* (equity aids the vigilant, not those who sleep on their rights)." *Stone v. Williams*, 873 F2d 620, 623 (2d Cir. 1989) (vacated on other grounds). Consequently, laches may bar a plaintiff's claim for equitable relief where "(1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay." *Ikelionwu v. United States*, 150 F.3d 233, 237 (2d Cir. 1998). Laches may be used to bar constitutional claims, *Southside Fair Hous. Comm. v. City of New York*, 928 F.2d 1336, 1354 (2d Cir. 1991), and the decision whether to apply the doctrine is left to the discretion of the district court, *King v. Innovation Books*, 976 F.2d 824, 832 (2d Cir. 1992).

Plaintiffs have not been diligent in asserting their legal rights. Their last effort to persuade the City to improve municipal services and infrastructure in Willets Point occurred in 1999. The complaint does not allege that they ever asserted a legal right to such services or threatened a lawsuit. Indeed, the only legal action ever threatened with respect to Willets Point occurred in the 1960s when Robert Moses proposed to turn much of the area into parking for Shea Stadium and the 1963-64 World's Fair. Moreover, while the letter plaintiffs sent to the City on March 14, 2008 (Compl. ¶¶ 72-73), in an obvious attempt to jump-start this lawsuit, could be read to threaten legal action, it was preceded by almost a decade of silence and legal

inaction in the face of what plaintiffs allege was a continuing "campaign of malicious and purposeful neglect" (*id.* at ¶ 34). Coincidentally, as was the case in the 1960s, the threat followed an attempt to change the character of the area in a way that would put plaintiffs out of business.

Finally, "although an evaluation of prejudice is another subject of focus in laches analysis, it is integrally related to the inquiry regarding delay. Where there is no excuse for delay, as here, defendants need show little prejudice; a weak excuse for delay may, on the other hand, suffice to defeat a laches defense if no prejudice has been shown." *See Stone*, 873 F.2d at 625. Mandating that the City pave roads, construct a sewage system, and otherwise improve the existing Willets Point infrastructure could interfere with the progress of the Plan formulated by the City at some expense (and subsequently approved by the City Council). Indeed, the plaintiffs have all but admitted that this is the purpose of the lawsuit. Thus, when asked at oral argument on this motion "why after all these years when the City has finally come up with a plan to revitalize Willets Point, . . . [have] your clients decided to sue?," plaintiffs' counsel responded "[b]ecause our clients have thriving businesses that have been, in some cases, there for two generations and they're being destroyed by taking over the property by eminent domain." (Hr'g Tr. 16:14-21, May 4, 2009.) The extraordinary relief requested by plaintiffs would in essence substitute their plan for the one on which the City has already expended resources in preparing and has received the requisite public approvals. The timing of this lawsuit as well as plaintiffs' own admissions at oral argument suggests that its real purpose of their lawsuit is to obstruct and forestall the implementation of the approved plan.

## CONCLUSION

In the end, this case involves a dispute between the elected officials of the City of New York and a group of small businesses over the manner in which an area of Queens should be developed. Plaintiffs, who have established thriving businesses (notwithstanding the grossly inadequate infrastructure of the area), and who employ hundreds of people, are understandably aggrieved by the fact that the Plan that the City is in the process of implementing has no place for them. Section 1983, however, was not enacted to involve federal judges in resolving such disputes.

The plaintiffs' § 1983 causes of action are dismissed. Because I decline to exercise jurisdiction over the pendent state law claims, *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966), they are dismissed without prejudice.

SO ORDERED.

Brooklyn, New York
November 25, 2009

*Edward R. Korman*
Edward R. Korman
Senior United States District Judge